**\*NOT FOR PUBLICATON\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICIA MADLINGER, on behalf of herself and others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>ENHANCED RECOVERY COMPANY, LLC,<br><br>　　　　　　　Defendant. | Civil Action No. 21-00154 (FLW)<br><br>OPINION |

**WOLFSON, Chief Judge:**

　　　This action arises out of a debt collection letter. Plaintiff, Patricia Malinger ("Madlinger" or "Plaintiff"), alleges that defendant, Enhanced Recovery Company, LLC ("ERC" or "Defendant") violated the Fair Debt Collection Practices Act (the "FDCPA") by sending out an allegedly misleading debt collection letter in violation of 15 U.S.C. §§ 1692e and 1692g, and improperly conveying Plaintiff's private information to a third-party in violation of §§ 1692c(b) and 1692f. Pending before the Court is Defendant's motion to dismiss the Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). However, as a threshold matter, the Court must determine whether Plaintiff has Article III standing to pursue her claims, which issue I raised *sua sponte*. In that regard, both parties have submitted supplemental briefing addressing Plaintiff's standing. Upon careful consideration of the parties' submissions, the Court finds that Plaintiff has not satisfied her burden of establishing Article III standing for her FDCPA claims. As such, this Court does not have subject matter jurisdiction over Plaintiff's claims. To the extent Plaintiff believes she can plead additional facts to cure the deficiencies in her multiple-

addresses FDCPA claims, as discussed below, Plaintiff is given leave to further amend her complaint as to those claims, within 30 days from the date of the accompanying Order. Plaintiff, however, lacks standing to bring her disclosure claim under the FDCPA as a matter of law.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from Plaintiff's Amended Complaint and are presumed to be true for the purpose of this Motion. Madlinger allegedly took out a store credit card from Kohl's for which Capital One, N.A. ("Capital One") was the original creditor. (Am. Compl. ¶ 14.) At some point thereafter, Plaintiff failed to make further payments on her account and defaulted. (Am. Compl., Ex. A.) Capital One transferred the account to ERC for the purpose of collecting Plaintiff's debt.

As part of Defendant's debt collection efforts, Defendant sent a collection letter dated January 6, 2020, to Plaintiff. However, Plaintiff alleges that ERC did not mail the letter directly to Plaintiff. Instead, according to Plaintiff, Defendant relied on a third-party vendor to prepare and mail the letter. (Am. Compl., ¶¶ 65-66.). Plaintiff alleges that, through its communication with the third-party vendor, Defendant disclosed personal and highly confidential information about Plaintiff, including her status as a debtor and the amount of debt she owed to Capital One. (Am. Compl. ¶ 67.). In sharing this information, Plaintiff alleges that Defendant violated the FDCPA's prohibition on certain communications with third parties, and used unfair means in connection with the collection of a debt. (*See id*. at ¶ 91(a) (citing 15 U.S.C. §§ 1692c, and 1692f)).

Additionally, Plaintiff alleges that Defendant violated sections 1692e, e(10), g, and g(b) of the FDCPA when it allegedly confused her by including four separate addresses in its collection letter. Specifically, the front top portion of the letter, which includes six paragraphs, states that "[u]nless [the debtor] dispute[s] the validity of the debt, or any portion thereof, within thirty (30)

2

days after receipt of the notice, the debt will be assumed to be valid by [ERC]. If [the debtor] notif[ies] [ERC's] office <u>below</u> in writing within the thirty-day period that the debt, or any portion thereof, is disputed, [ERC] will obtain verification of the debt or a copy of any judgment that may be of record against [the debtor]." (*See* Debt Collection Letter, dated January 6, 2020, p. 1) (emphasis added). In the following paragraph, the letter indicates that "[u]pon [the debtor's] <u>written request to this office</u> within the thirty-day period, [ERC] will provide [the debtor] with the name and address of the original creditor, if different from the current creditor listed in the above section of this notice." *Id*. (emphasis added).

Plaintiff alleges that the least sophisticated consumer would be confused as to which "office" a debt verification letter should be sent to because the fifth paragraph states that debt verification should be sent to "[ERC's] office below," while the sixth paragraph refers to "this office." (Am. Compl. ¶ 43.) According to Plaintiff, "[i]t is unclear if '[ERC's] office below' and 'this office' are the same or different places," and the least sophisticated consumer could either conclude that he or she would have to send out two separate debt verification letters or be dissuaded from disputing the debt at all. (*Id*. ¶¶ 46-47.)

Towards the bottom of the first page the letter includes a symbol of an envelope and states "Send correspondence to: ERC®, P.O. Box 57610, Jacksonville, FL 32241." There is a separate, detachable pre-addressed portion of the letter below a perforated line that includes both Madlinger's address, as well as another address for ERC at P.O. Box 23870, Jacksonville, FL 32241-3870, that is distinct from the "send correspondence to" address. Additionally, at the top left of the detachable portion of the letter, it states "Please do not send correspondence to this address. P.O Box 1259, Dept 98696 Oaks, PA 19456." Finally, on the reverse side of the letter alongside a federal notice and information directed to residents from Tennessee, Minnesota, North

3

Carolina, Colorado, California, and Massachusetts, it states "Our Corporate Information is: Enhanced Recovery Company, LLC, Doing Business As, ERC® and/or Enhanced Resource Centers 8014 Bayberry Road Jacksonville, FL 32256." (Debt Collection Letter, p. 2.) Plaintiff alleges that the "problem with the Collection Letter is that it contains four separate addresses for Defendant." (Am. Compl. ¶ 55.) What is more, Plaintiff contends that the least sophisticated consumer could be confused by the statement's reference to his or her right to "dispute the validity of the debt," as well as the labeling of an address as for "correspondence," not disputes. (*Id*. ¶¶ 57-59.) Furthermore, Plaintiff maintains that the least sophisticated consumer could interpret the statement's references to an "office" and "ERC's office below" to mean a physical office address, not a P.O. Box, and conclude that none of the three addresses on the front of the letter is the correct address for disputes. In short, Plaintiff alleges that this confusion "overshadowed the disclosure of the consumer's right to dispute the debt and obtain verification of the debt."[1] (*Id*. ¶ 63.)

On January 5, 2021, Plaintiff filed a complaint against Defendant alleging that its use of multiple addresses in the collection letter, dated January 6, 2020, was false and misleading in violation of 15 U.S.C. §1692, *et seq*. (ECF No. 1.) Defendant then moved to dismiss Plaintiff's multiple address claims. Following Defendant's initial motion to dismiss, Plaintiff amended her complaint to add a third-party disclosure claim. (ECF No. 6.) Defendant moved to dismiss the amended complaint. Plaintiff opposed the motion to dismiss. Prior to assessing the pleadings, the Court denied Defendant's motion to dismiss, without prejudice, pending further briefing from the parties analyzing whether Plaintiff has established standing to bring each of her claims in light of the Supreme Court's decision in *TransUnion LLC v. Ramirez*,__U.S.__, 141 S. Ct. 2190 (2021).

---

[1] While the Court does not assess the merits of Plaintiff's claim, with the inclusion of these multiple addresses on the debt collection letter, it appears that the least sophisticated consumer could be confused as to where to send disputes.

4

## II.     LEGAL STANDARD

Before addressing the merits of a dispute, a court must determine whether it has subject-matter jurisdiction over the case before it.  *See Hollingsworth v. Perry*, 570 U.S. 693, 704–05 (2013).  Article III of the U.S. Constitution limits the judicial power of federal courts to deciding "cases" or "controversies." § 2.  This limitation serves the purpose of "prevent[ing] the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty*, 568 U.S. 398, 408 (2013) (citations omitted).

The doctrine of standing to sue is "rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To satisfy Article III's standing requirements, the Supreme Court has established that a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Absent standing, there is no case or controversy, and a federal court cannot exercise subject-matter jurisdiction over the plaintiff's claims.  Courts have an independent obligation to assess whether standing exists.  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12 (h)(3); *see also Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) (A court "can dismiss a suit *sua sponte* for lack of subject jurisdiction at any stage in the proceeding.").

## III.     DISCUSSION

This concreteness element of standing is my concern here.  A concrete injury must be "*de*

5

*facto*," —*i.e.*, it must "actually exist." *Spokeo*, 578 U.S. at 340 (quotation marks omitted). Tangible and intangible harms can be "concrete." *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (violation of free speech); *Meese v. Keene*, 481 U.S. 465, 473 (1987) (reputational harms); *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008) (disclosure of private information). Although the alleged injury need not be in the form of a tangible injury such as a physical or monetary harm to be "concrete," it must be "'real,' and not 'abstract.'" *Spokeo*, 578 U.S. at 340.

The question before me is whether Plaintiff has alleged that she suffered a concrete harm. The Supreme Court has explained that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008). In *Spokeo*, the Court instructed that courts should consider whether the alleged injury has a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341 (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)). Congress's judgment on the identification of intangible harms is "instructive." *Id*. Indeed, Congress may elevate *de facto* injuries previously inadequate in law to the status of concrete "legally cognizable injuries." *Lujan*, 504 U.S. at 578. However, although Congress plays an important role in identifying and elevating intangible harms, a plaintiff does not satisfy the injury-in-fact requirement of standing whenever a statute grants a person a statutory right, and authorizes lawsuits to vindicate that right. *Spokeo*, 578 U.S. at 341. Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*.

Until recently, *Spokeo* left open the possibility that the mere "risk of real harm" could satisfy the concreteness requirement. *Id*. In *TransUnion LLC v. Ramirez*, however, the Supreme

6

Court clarified that material risk of future harm can only serve as a basis for standing as a concrete harm in suits where a person exposed to the risk of such harm pursues injunctive relief to prevent the harm from occurring.  141 S. Ct. at 2210.  More broadly, the Court explained how the Article III "concrete harm" principle operates in practice by the following example of two hypothetical plaintiffs.  *Id*. at 2205.

> Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine.

*Id*.  In this example, the Court instructed that only the plaintiff from Maine has Article III standing to proceed in federal court because she suffered concrete harm to her property.  *Id*. at 2206.  On the other hand, the Court explained that the second lawsuit could not proceed because the plaintiff had not suffered any "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id*. at 2206.   In brief, the Court made clear that a violation must "personally harm" the plaintiff for her to suffer a "concrete" harm.

*TransUnion* involved a class-action against a credit reporting agency that produced credit reports containing personal information about individuals for purchase by third parties.  *Id*. at 2201–02.  The plaintiffs claimed reputational injuries stemming from allegations that the credit reporting agency, TransUnion, failed to use reasonable procedures to ensure the accuracy of their credit files, in violation of the Fair Credit Reporting Act ("FCRA").  *Id*. at 2200. Specifically, TransUnion provided credit reports to third parties bearing misleading alerts that the individual consumers' names were "potential matches" to names on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") list of terrorists, drug traffickers, and other serious criminals.  *Id*. at 2201.  However, while all class members had OFAC alerts in their credit files, the parties

stipulated that only approximately 20 percent of the class had their credit reports shared with third parties. *Id*. at 2202. Critically, the Court held that only the members whose credit reports were shared with third-party businesses demonstrated concrete reputational harm, and thus had Article III standing.[2]

Here, Plaintiff argues that she has suffered concrete harms sufficient to confer Article III standing to bring her multiple-addresses and disclosure claims in federal court. "Standing is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id*. at 2208 (citations omitted). Accordingly, the Court addresses each category of harm, in turn.

### A. Plaintiff does not have standing to bring her multiple-addresses claims.

In support of standing for her claim that Defendant violated sections 1692e and 1692g of the FDCPA by including multiple addresses in its debt collection letter, Plaintiff alleges that the least sophisticated consumer would be confused as to where to send a debt verification request and could believe that none of the addresses in the letter was the correct address to dispute the debt. (Am. Compl. ¶¶ 58, 61.) With respect to injury and harm, Plaintiff alleges that she suffered "injury" by being "subjected to unfair and abusive practices of Defendant" and "actual harm" by being "the target of Defendant's misleading debt collection communications." (Am. Compl. ¶¶ 80–81.) Defendant agrees that Plaintiff has alleged sufficient facts showing Article III standing. As I have the independent obligation to assess standing, I disagree with both parties.

---

[2] In two other claims, all class members complained about formatting defects in mailings received from *TransUnion*. The Court held, however, that only Ramirez demonstrated concrete harm stemming from the alleged formatting errors, and consequently found that except for Ramirez, the remainder of the class lacked standing as to those two claims. *Id*. at 2200. In any event, there are no such formatting error allegations present in this case.

First, Defendant relies on *Oh v. Collecto* in support of its argument in favor of standing on the multiple-addresses claims. No. 2001937, 2021 WL 3732881, at *3 n.3 (D.N.J. Aug. 23, 2021). Defendant's wholesale reliance on *Oh v. Collecto*, however, is misplaced. In *Oh*, the court determined that there cannot be standing if the plaintiff did not read the debt collection letter. *Id.* at *3. There, the court reasoned that because the plaintiff had testified that she had not even seen the letter, let alone read the letter, she did not experience any harm from the alleged violations that she asserted in the complaint. *Id.* In a footnote, the court noted it was "not so sure" whether it agreed with courts of appeals that have held that confusion alone is not a concrete injury in FDCPA cases under *TransUnion* or *Spokeo*, because confusion is a "real emotion[] felt by people and thus [a] 'harm[],' albeit [a] minor one[]." *Id.* at *3 n.3. However, the court stopped short of deciding the issue since the plaintiff had not shown that she actually experienced any confusion. *Id.*

The Third Circuit has not yet had occasion to consider whether confusion alone constitutes a concrete injury following the Supreme Court's ruling in *TransUnion*. However, the sixth and seventh courts of appeals have considered this issue, and have squarely rejected general allegations of confusion, alone, as insufficient to confer standing. *See, e.g.*, *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 363 (6th Cir. 2021) ("as we have held before, confusion alone is not a concrete injury for Article III purposes"); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) (rejecting plaintiff's testimony that the debt collector's letter confused her as to whether she could be sued for the debt as inadequate to confer standing in the FDCPA context); *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) ("a plaintiff's state of confusion resulting from an FDCPA-deficient communication, without any ensuing detriment, is not a concrete injury for if it were, then everyone would have standing to litigate

9

about everything.") (internal quotation marks and citations omitted).  I am persuaded by those decisions.

*TransUnion* emphasized that *Spokeo* requires plaintiffs to identify a "close historical or common-law analogue for their asserted injury," albeit not an "exact duplicate." *TransUnion*, 141 S. Ct. at 2204.  I agree with the Sixth and Seventh Circuits that mere "[c]onfusion does not have 'a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit.'" *Garland v. Orlans, P.C.*, 999 F.3d 432, 437 (6th Cir. 2021) (quoting *Spokeo*, 578 U.S. at 340–41).  Moreover, in this case, neither party has identified a traditional harm at common law that bears a close relationship with a state of confusion.

However, some courts have recognized that in certain circumstances, confusion, when coupled with action or inaction, can have a sufficiently close relationship to common-law fraud. Specifically, misleading, confusing debt communications can cause harm sufficiently concrete for Article III standing under the common-law analogue of fraudulent and negligent misrepresentation.  *See Huber v. Simon's Agency, Inc.*, No. 19-01424, 2022 WL 1801497, at *4 (E.D. Pa. June 2, 2022) ("Adequacy of informational harms for standing purposes [] turns on a plaintiff's consequential action or inaction following receipt of a misleading or deceptive collection letter . . . ."); *compare Thome v. Sayer L. Grp., P.C.*, No. 20-3058, 2021 WL 4690829, at *11 (N.D. Iowa Oct. 7, 2021) (finding plaintiff "detrimentally relied on defendant's misrepresentation when she became confused about her rights, choosing not to obtain representation and dispute her debt because she believed she did not have enough time"), *with Kola v. Forster & Garbus LLP*, No. 19-10496, 2021 WL 4135153, at *6–7 (S.D.N.Y. Sept. 10, 2021) (finding no close relation to fraudulent or negligent misrepresentation where plaintiff merely argued that a debt collection letter was confusing or misleading without alleging any decision made in reliance on the letter).

To prove fraudulent misrepresentation, a plaintiff must demonstrate: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Bulboff v. King Aircraft Title, Inc.*, No. 19-18236, 2021 WL 1186822, at *7 (D.N.J. Mar. 30, 2021). Likewise, negligent misrepresentation claims require a showing of harm "caused to [plaintiffs] by their justifiable reliance upon" the false information. Restatement (Second) of Torts, § 552(1) (1977). "[I]f the plaintiff has not relied, the misrepresentation has caused no harm." Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 671 (2d ed. 2021). In other words, under common-law, "there can be no recovery if the plaintiff is none the worse off for the misrepresentation, however flagrant it may have been." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 998 (11th Cir. 2020) (citation and quotations omitted).

Here, Plaintiff's allegations of confusion do not demonstrate a harm closely related to fraudulent or negligent misrepresentation. Importantly, Plaintiff does not allege reliance of any kind. Indeed, she does not suggest that she relied on the multiple addresses in the letter in making any decision about disputing or verifying her debt. Rather, general allegations regarding the possibility that the least sophisticated consumer would be confused as to which address to send a debt verification letter are insufficient. *See Trichell*, 964 F.3d at 1004 (dismissing FDCPA lawsuit for lack of standing where plaintiffs sought to recover for representations they asserted were misleading, but failed to prove that "they relied on the representations, much less that the reliance caused them any damages"); *Huber*, 2022 WL 1801497, at *4 (collecting cases on the

11

insufficiency of general confusion allegations).³  Plaintiff posits that the least sophisticated consumer "may reasonably conclude that they [sic] would have to send out two separate debt verification letters" or alternatively, "may be dissuaded from disputing the debt at all, since he or she may not know which office the debt should be disputed." (Am. Compl. ¶¶ 46-47.) These speculations aside, however, nowhere in Plaintiff's amended complaint does she allege that she sought to send out a debt verification letter, let alone two separate debt verification letters, or that she refrained from sending a letter to her detriment because she was somehow discouraged by the multiple addresses in the debt collection letter.  And, to the extent that Plaintiff alleges that she <u>may</u> act or refrain from acting because of the letter, these future risk-based allegations also fail under *TransUnion*.  Although the Supreme Court addressed the context of Fair Credit Reporting Act suits, it nonetheless clarified more broadly that "the mere risk of future harm, standing alone, cannot qualify as a concrete harm." 141 S. Ct. at 2210–11.  Consequently, as the allegations stand, Plaintiff's general allegations of confusion and misleading debt communications in violation of §§ 1692e, e(10), (g), and g(b) do not amount to a concrete, injury-in-fact sufficient for Article III standing.  *See Sandoval v. Midland Funding, LLC*, No. 18-09396, 2022 WL 2116769, at *5 (D.N.J. June 13, 2022) ("Plaintiffs in this case, like those in *Ramirez*, simply have suffered no concrete harm sufficient to confer standing—an alleged statutory violation alone does not cut it"); *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1153 (7th Cir. 2022) (recognizing that debt collectors failure to

---

³    In *Huber*, the court found that the plaintiff and the class suffered an injury-in-fact and satisfied their burden of establishing Article III standing for their §1692e deceptive letter claims. *Id*. at *5.  Unlike the facts before the Court in this case, the plaintiff and class, there, suffered informational and financial injury when they received letters that were not only confusing as to the amount to be paid, but precluded them from being able to pay down their debts or otherwise take appropriate action due to the misinformation in the letters. *Id*. at *4.  Indeed, here, Plaintiff does not allege the same "brand of informational harm—being provided with misleading or deceptive information about a debt, such that the debtor cannot know how much they must pay to settle that debt. . . ." *Id*.

12

report a debt dispute to credit reporting agencies constituted a statutory violation under § 1692e(8) but citing *TransUnion* for the proposition that a statutory violation alone does not make an injury concrete); *Ergas v. Eastpoint Recovery Grp., Inc.*, No. 20-333, 2022 WL 1471348, at *9 (W.D.N.Y. May 10, 2022) ("[M]ere[] allege[d] violations of the FDCPA [] alone do[] not state an injury-in-fact for Article III standing."). Accordingly, Plaintiff has not sufficiently alleged Article III standing to bring her multiple-addresses claims.

### B. Plaintiff does not have standing to bring her disclosure claims.

Plaintiff next argues that by disclosing her confidential information to a third-party mailing vendor, Defendant violated sections 1692c(b) and 1692f of the FDCPA. Section 1692c(b) precludes debt collectors from "communicat[ing], in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector" without prior consent of the consumer or express permission of the court. Plaintiff alleges that in communicating with the third-party vendor, Defendant disclosed sensitive information about Plaintiff, including "his [sic] name, the amount allegedly owed, Plaintiff's home address and other information." (Am. Compl. ¶ 75.) In doing so, Plaintiff alleges that this disclosure constituted an "unfair or unconscionable means to collect or attempt to collect any debt" in violation of §1692f. According to Plaintiff, she was "harmed by being subject to abusive collection practices, from which she had a substantive right to be free of having her privacy invaded and by having her private and protected information shared and disseminated with unauthorized parties." (*Id*. ¶ 78.)

Applying the same historical or common-law analogue exercise as outlined above, I find that the harm Plaintiff alleges most closely resembles the privacy cause of action for public disclosure of private facts. New Jersey courts have instructed that to state a claim for public

disclosure of private facts, a plaintiff must demonstrate (1) that the defendant has given publicity to matters that actually were private, (2) that dissemination of such facts would be offensive to a reasonable person and (3) that the public has no legitimate interest in being apprised of the facts publicized.  *See, e.g.*, *Bisbee v. John C. Conover Agency, Inc.*, 186 N.J. Super. 335, 340 (App. Div. 1982); *see also* Restatement (Second) of Torts § 652D.  The Restatement defines publicity as follows:

> "Publicity" . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . . Thus it is not an invasion of the right to privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

Restatement (Second) of Torts § 652D, Comment (a).  Although the Third Circuit has not addressed the tort of public dissemination of private information in the context of third-party mail vendors, at least three other district courts within the Third Circuit have done so, and have rejected the qualification of the "mail vendor" claim as a public dissemination of private information tort. As a result, none of these courts found the "mail vendor" theory sufficient to establish Article III standing.  Critically, in all three of those cases, the district courts found the lack of "publicity" fatal to the plaintiffs' attempted analogization of the mail vendor theory to the tort of disclosure of private facts.  *See Rohl v. Pro. Fin. Co., Inc.*, No. 2117507, 2022 WL 1748244, at *3 (D.N.J. May 31, 2022) (finding no publication where plaintiff's complaint did "not allege that her private information was publicized to the general public"); *Pagan v. Convergent Outsourcing*, Inc., No. 21-12130, 2022 Lexis 71428, at *10 (D.N.J. Mar. 30, 2022) (observing that "[p]laintiffs do not allege that anyone actually read their information (rather than merely processed it), or that there has otherwise been publicity to any meaningful degree"); *Barclift v. Keystone Credit Servs., LLC*,

14

No. 21-4335, 2022 WL 444267, at *9 (E.D. Pa. Feb. 14, 2022) ("[e]ven assuming that the employees of the mailing vendor read [the plaintiff's] personal information, sharing her personal information with 'a small group of persons is not publicity.'") Consequently, the courts determined that the plaintiffs lacked standing to bring their mailing vendor claims.

In the instant matter, Plaintiff's mail vendor theory of harm fails for the same reason—it involves no publicity. Indeed, nothing in Plaintiff's amended complaint alleges that her information, including her name, address, and debt owed, ever was made accessible to more than a single individual who populated her letter, let alone the broader public. The amended complaint alleges only that her information was communicated to the third-party letter vendor. (Am. Compl. ¶ 75.) Taking the facts in the light most favorable to the Plaintiff, even were the Court to construe the amended complaint as alleging that a small group of letter vendor employees may have read the collection letter, such a communication would be insufficient. *See Hamza v. United Cont'l Holdings, LLC*, No. 19-8971, 2021 WL 3206814, at *10 (D.N.J. July 29, 2021) ("it is not an invasion of the right to privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons") (internal quotations and citations omitted).

In *TransUnion*, the Supreme Court instructed that "disclosures to printing vendors," similar to the mailing vendor in this case, are not considered a "publication" in the context of a defamation claim. 141 S. Ct. at 2210 n.6. Although this observation constituted dicta in a footnote in the Court's opinion, "[t]he bar for satisfying 'publication' requirement in a defamation claim is much lower than the bar for establishing 'publicity' in a privacy claim." *Barclift*, 2022 WL 444267, at *9. Thus, if disclosure to printing vendors does not constitute publication in the context of defamation, neither does disclosure to mailing vendors in a privacy claim, here.

Nevertheless, Plaintiff argues that she has Article III standing for her disclosure claims based on *Khimmat v. Weltman, Weinberg & Reis Co.*, a recent decision issued by the Eastern District of Pennsylvania. No. 21-02944, 2022 U.S. Dist. LEXIS 21076, *12 (E.D. Pa. Feb. 7, 2022). There, the district court was faced with the mailing vendor theory, and interpreted the same footnote in *TransUnion* as recognizing that a plaintiff might suffer an injury where a letter vendor read, and did not merely process the information.[4] *Id*. However, *Khimmat* is distinguishable from the instant case as it only discussed the interpretation of the FDCPA, not Article III standing. *See id.*, at *1, ("[T]his dispute is about whether Congress meant what it said in the [FDCPA].").[5]

---

[4]  The full text of the Supreme Court's dicta in *TransUnion* on plaintiffs' internal publication argument is as follows:

> For the first time in this Court, the plaintiffs also argue that TransUnion "published" the class members' information internally—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received. That new argument is forfeited. In any event, it is unavailing. Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation. See, *e.g., Chalkley* v. *Atlantic Coast Line R. Co.*, 150 Va. 301, 326-328, 143 S. E. 631, 638-639 (1928). Nor have they necessarily recognized disclosures to printing vendors as actionable publications. See, *e.g., Mack* v. *Delta Air Lines, Inc.*, 639 Fed. Appx. 582, 586 (CA11 2016). Moreover, even the plaintiffs' cited cases require evidence that the defendant actually "brought an idea to the perception of another," Restatement of Torts §559, Comment *a*, p. 140 (1938), and thus generally require evidence that the document was actually read and not merely processed, cf. *Ostrowe* v. *Lee*, 256 N. Y. 36, 38-39, 175 N. E. 505, 505-506 (1931) (Cardozo, C. J.). That evidence is lacking here. In short, the plaintiffs' internal publication theory circumvents a fundamental requirement of an ordinary defamation claim—publication—and does not bear a sufficiently "close relationship" to the traditional defamation tort to qualify for Article III standing.

*TransUnion*, 141 S. Ct. at 2210 n.6.

[5]  The court is aware of three decisions issued by other courts that have approved of the mailing vendor theory, one of which was vacated. *See, e.g., Hunstein v. Preferred Collection &*

16

Moreover, a brief look to legislative history does not favor standing for these types of disclosure claims. Indeed, the alleged incidental sharing of Plaintiff's information is not the type of practice that concerned Congress when it enacted the FDCPA. Congress passed the FDCPA to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). In that regard, Congress was concerned with a consumer's sensitive information being disclosed "to friends, neighbors, or an employer," not disinterested mailing vendors. S. Rep. No. 95–382, at 2 (1977). In fact, "[w]hat matters is not so much the amount or the nature of the debt, but to whom the information is exposed." *Sputz v. Alltran Financial, LP*, No. 21-4663, 2021 WL 5772033, at *5 (S.D.N.Y. Dec. 5, 2021). Mailing vendors are more akin to "modern-day stenographer[s] or clerk[s], briefly viewing the information for the purpose of creating and/or processing a communication," than employers who could conceivably inflict economic or reputational harm upon reviewing certain sensitive information regarding their employees. *Cavazzini v. MRS Assocs.*, No. 21-5087, 2021 WL 5770273, at *6 (E.D.N.Y. Dec. 6, 2021). The routine mailing of a letter by a third-party vendor notifying a consumer that their outstanding debt has been placed with a debt collector for collection is a far cry from the abusive, harassing debt collection practices that Congress sought to curtail.

Here, Plaintiff alleges that she sustained a concrete, actual injury by being subjected to "abusive collection practices." (Am. Compl. ¶ 78.) . In the first instance, she asserts that

---

*Mgmt. Servs., Inc.*, 17 F.4th 1016 (11th Cir. 2021), *reh'g en banc granted, opinion vacated*, 17 F.4th 1103 (11th Cir. 2021) (finding that the mailing vendor theory establishes standing for FDCPA claims); *Thomas v. Unifin, Inc.*, No. 21-3037, 2021 WL 3709184, at *2 (N.D. Ill. Aug. 20, 2021) (relying on the now vacated opinion by the Eleventh Circuit in finding standing for the mailing vendor claims); *Keller v. Northstar Location Servs.*, No. 21-3389, 2021 WL 3709183, at *2 (N.D. Ill. Aug. 20, 2021) (same). Notwithstanding these non-binding decisions, which have questionable value since *Hunstein* has been vacated, the Court will follow the majority of district courts in this Circuit, and numerous courts outside of the Third Circuit, that have rejected such theory as a basis for Article III standing. *See Barclift,* 2022 WL 444267, at *8 (listing cases).

Defendant disclosed her status as a debtor, the fact that she owed $604.83 to Capital One, N.A., and "other highly personal and confidential information about Plaintiff and his [sic] account" to the third-party letter vendor. (*Id*. ¶ 67.) Following the disclosure, Plaintiff alleges that the "[l]etter vendor then populated some or all of this information into a pre-written template, which it printed and mailed to Plaintiff's residence in New Jersey." (*Id*. ¶ 67.) But Plaintiff does not allege that her information was read by a single person, much less the broader public. Without these allegations, Plaintiff's alleged harms are no more than alleged statutory violations. Importantly, as the Supreme Court clarified in *TransUnion*, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." 141 S. Ct. at 2205. Absent publication, Plaintiff has not alleged a concrete harm. And if there is no concrete harm, there cannot be standing. *Id*. at 2200 ("No concrete harm, no standing."). Accordingly, I find that Plaintiff does not have Article III standing for her §§ 1692c(b) and 1692f claims.

## IV.   CONCLUSION

For the foregoing reasons, I find that Plaintiff lacks standing to bring both multiple-addresses and disclosure claims under the FDCPA. Nonetheless, to the extent Plaintiff believes she can plead additional facts that demonstrate that she relied on the multiple addresses in the debt collection letter to her detriment, Plaintiff is given leave to further amend her amended complaint within 30 days from the date of the accompanying Order. Plaintiff's disclosure claims are dismissed with prejudice.

**DATED**: June 21, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson

                                                U.S. Chief District Judge

Case 3:21-cv-00154-FLW-DEA   Document 21   Filed 06/21/22   Page 19 of 19 PageID: 220